(19)

FＤＩＳ

```
┌─────────────────────────────────┐
│             FILED               │
│                                 │
│          AUG 21 2018            │
│                                 │
│  UNITED STATES BANKRUPTCY COURT │
│   EASTERN DISTRICT OF CALIFORNIA│
└─────────────────────────────────┘
```

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re ) | Case No. 17-23968-A-7 |
| ) | |
| PATRICK WADE PITTS and MICHELE ) | |
| LEE PITTS, ) | |
| ) | |
| Debtors. ) | |
| ) | |
| ——————————————————————— ) | |
| ) | Adv. No. 17-2161 |
| MATHEW M. LAKOTA, ) | |
| ) | |
| Plaintiff, ) | Date: June 7, 2018 |
| ) | Time: 1:00 p.m. |
| vs. ) | Dept: A |
| ) | |
| PATRICK WADE PITTS and MICHELE ) | |
| LEE PITTS, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ——————————————————————— ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried by the court on June 7, 2018.
Plaintiff Mathew M. Lakota appeared on his own behalf and
defendants Patrick and Michele Pitts appeared with their attorney
of record, Richard Jare. Following the trial, the parties were
given the opportunity to file post-trial briefs. Only the

1  defendants availed themselves of this opportunity.

2       Having considered the evidence presented at trial as well as

3  the post-trial brief of the defendants, the court now makes its

4  findings of fact and conclusions of law.

5       This is an action to determine the dischargeability of a

6  debt.  It is a core proceeding in which this court may enter a

7  final judgment.  28 U.S.C. § 157(b)(2)(I).

8       For the reasons explained below, the court determines that

9  the debt referred to in the complaint is dischargeable.  A

10 separate judgment will be issued in favor of the defendants.

11

12                        Findings of Fact

13      1.   In 2005, the defendants and Penny and Terry England

14 entered into a transaction concerning real property located at 20

15 Pamela Jane Court in Oroville, California.  The defendants and

16 the Englands, however, have dramatically different

17 interpretations of that transaction.

18      2.   According to the Englands, they purchased the house for

19 their own account and then rented it to the defendants.

20      3.   According to the defendants, they purchased the house

21 but placed title in the Englands' name.  Precisely why this was

22 done is unclear.  Nonetheless, there is support for the

23 defendants' assertion that they were the beneficial owners of the

24 home.

25      a.   Mrs. England is the sister of Mr. Pitts.  Their family

26           connection, as well as the fact that both defendants

27           worked in businesses operated by Mrs. England, suggests

28           a situation in which the parties would agree to such an

                                -2-

1   informal arrangement.

2   b.   There is no written lease or rental agreement between

3        the defendants and the Englands.  Mrs. England has

4        extensive real estate holdings.  If the home was leased

5        to the defendants, it is surprising, given Mrs.

6        England's real estate expertise, that a lease was not

7        documented in a written agreement.  See Exhibit C.

8   c.   After the purchase, the defendants on occasion paid the

9        mortgage on the home directly to the mortgage holder.

10       See Exhibits E and H.  This changed around late 2013.

11       From that point on, the defendants began to make the

12       mortgage payment to the Englands, who in turn paid the

13       mortgage.  See Exhibits 1 and H.  However, the monthly

14       amount paid by the defendants continued to be the

15       amounts due on the mortgage and for the insurance on

16       the home.  The checks written by the Pitts to Mrs.

17       England typically stated on the memo line that the

18       check was a "house" payment.  There is no reference to

19       a rent or lease payment.

20  d.   The defendants made improvements to the home at their

21       own expense.  These improvements included sprinklers,

22       siding, a sliding door, retaining wall, fencing, and

23       solar panels.

24  e.   In addition to paying a monthly amount that matched the

25       Englands' monthly mortgage obligation, the defendants

26       also paid the property taxes on the home.

27  These facts lend credence to the defendants' assertion that they

28  were the beneficial owners of the home.

4.    As noted above, the defendants installed solar panels on the home.  This occurred around May or June 2015.  <u>See</u> Exhibit D.  The purchase and installation was financed and the installer filed a lien on the house to secure the transaction.

      a.    According to the Englands, the defendants forged the Mrs. England's signature on the contract with the installer, Exhibit D, and the transaction was without their knowledge or consent.  The Englands discovered the lien in November 2015.

      b.    The defendants deny that they signed Mrs. England's name on the contract or that they granted a lien to the seller/installer of the solar panels.  They believed the cost of the purchase and installation was covered by a government program.

      c.    The contract for the panels purports to be signed electronically by Mariah Pitts, the defendants' adult daughter, and Mrs. England.

      d.    A review of the contract, Exhibit D, suggests that the culprit may be the seller/installer of the solar panels.  This is suggested by the following:

          i.    Because Mariah Pitts was not purchasing the panels, because she had no interest in the home, and because the contract does not identify her as acting for her parents, her name on the contract makes very little sense.

          ii.   The email address for Mrs. England is not her address.

          iii.  The time stamps indicate that the contract was

1    sent electronically on June 11, 2015 to Mariah
2    Pitts at 11:49:50 AM, was reviewed by her at
3    11:50:43 AM, and then signed at 11:51:40 AM.  In
4    other words, Mariah Pitts supposedly viewed a 22-
5    page document on her mobile device within 46
6    seconds of its transmission, and then completed
7    her review and signed it within 1 minute and 50
8    seconds of its transmission.
9    iv.    Mrs. England took just a bit longer to review and
10         sign the documents (supposedly).  It took her 2
11         minutes and 53 seconds from its transmission to
12         begin her review.  She finished her review and
13         signed it 56 seconds later.
14   v.     The electronic signatures of Mrs. England and
15         Mariah Pitts each appear three times in the
16         contract.  Two of their signatures are dated June
17         11, the same date the contract purports to have
18         been sent electronically to them.  Inexplicably,
19         their third electronic signatures are dated May
20         26, 2015, 16 days before the electronic
21         transmission of the contract to them.
22        5.    Because it is unnecessary to a resolution of this
23   proceeding, the court does not determine whether the Englands or
24   the defendants own the home.  The court determines only that the
25   defendants had a bona fide belief that they had an ownership
26   interest in the home, that this belief was not unreasonable in
27   the circumstances outlined above, and that the defendants also
28   believed they were acting within their rights to improve the

1  home, including installing the solar panels.  The evidence does
2  not support the assertion that the defendants forged Mrs.
3  England's name on the contract for the panels.

4      6.    The breakdown in the relationship between the Pitts and
5  the Englands does not coincide with Mrs. England's discovery of
6  the lien for the solar panels.  This began before that discovery.

7      7.    Mr. Pitts was "disassociated" from Mrs. England's
8  manufactured home business on September 28, 2015.  Exhibit G.
9  Despite this, the defendants continued to live in the home and
10 pay the monthly "house" payment to Mrs. England.

11      8.    Even after her discovery of the lien in November 2015,
12 Mrs. England did nothing to disturb the defendants' occupancy of
13 the house until the summer of 2016.  From November 2015 through
14 the summer of 2016, the defendants continued to live in the home
15 and pay the monthly "house" payment to Mrs. England.

16      9.    On August 1, 2016, Mrs. England fired Mrs. Pitts from a
17 business owned by the Englands.  Despite the job loss, on August
18 5, the defendants wrote two checks to Mrs. England, one in the
19 amount of $1,107 for the "house payment" and a second in the
20 amount of $54.37 for "Farmers Home Owners Insurance."  These
21 checks were mailed on August 8.  Exhibit 1.

22      10.   On August 12, 2016, Mrs. England served a three-day
23 notice demanding that the defendants remove three abandoned
24 vehicles from their home and remove the solar panels.  Exhibit 2,
25 p. 4.  Additionally, they were served with a 30-day notice to
26 quit.  Exhibit 2, p. 2, paragraph 7.  This meant that even if the
27 defendants complied with the three-day notice, Mrs. England was
28 intent on terminating what she believed to be their month-to-

1   month tenancy.

2       11.   This prompted the defendants to stop payment on their

3   two checks.  If they were going to be evicted, and if Mrs.

4   England was going to dispute their ownership of the property,

5   they were not going to continue to pay for the home until their

6   dispute was resolved.

7       12.   Mrs. England filed an unlawful detainer action on

8   August 18.  She demanded the defendants' eviction on the ground

9   that they had not complied with the three-day notice.  The

10  complaint makes no reference to the defendants stopping payment

11  on their two checks.

12      13.   The unlawful detainer action did not go to trial.

13  Instead, on the day scheduled for trial, the defendants agreed to

14  relinquish possession.  Actual possession was given to Mrs.

15  England on September 15, 2016.

16      14.   There is nothing in the record suggesting that the

17  defendants agreed they had no interest in the property or that

18  they were compromising their right to pursue their claim to the

19  property.[1]

20      15.   After obtaining possession of the property, Mrs.

21  England filed two small claims court actions against the

22  defendants, one for each check on which payment had been stopped.

23  Each action was based on Cal. Civil Code § 1719, which provides

24

25      [1] The court takes judicial notice of the defendants'

26  bankruptcy schedules filed June 25, 2017, which list a cause of
    action against the Englands "for damages or for ownership" of the

27  subject property.  The court takes further judicial notice of its
    order filed June 18, 2018, abandoning this cause of action to the

28  defendants.

-7-

in relevant part:

    (a)(1) . . . any person who passes a check on insufficient funds shall be liable to the payee for the amount of the check and a service charge payable to the payee for an amount not to exceed twenty-five dollars ($25) for the first check passed on insufficient funds and an amount not to exceed thirty-five dollars ($35) for each subsequent check to that payee passed on insufficient funds.

    (2) . . . any person who passes a check on insufficient funds shall be liable to the payee for damages equal to treble the amount of the check if a written demand for payment is mailed by certified mail to the person who had passed a check on insufficient funds and the written demand informs this person of (A) the provisions of this section, (B) the amount of the check, and (C) the amount of the service charge payable to the payee. The person who had passed a check on insufficient funds shall have 30 days from the date the written demand was mailed to pay the amount of the check, the amount of the service charge payable to the payee, and the costs to mail the written demand for payment. . . .

    (3) Notwithstanding paragraphs (1) and (2), a person shall not be liable for the service charge, costs to mail the written demand, or treble damages if he or she stops payment in order to resolve a good faith dispute with the payee. The payee is entitled to the service charge, costs to mail the written demand, or treble damages only upon proving by clear and convincing evidence that there was no good faith dispute, as defined in subdivision (b).

    . . .

    (6) As used in this subdivision, to "pass a check on insufficient funds" means to make, utter, draw, or deliver any check, draft, or order for the payment of money upon any bank, depository, person, firm, or corporation that refuses to honor the check, draft, or order for any of the following reasons:

    (A) Lack of funds or credit in the account to pay the check.

    . . .

    (C) The person who wrote the check instructed the drawee to stop payment on the check.

    (b) . . . A "good faith dispute" is one in which the court finds that the drawer had a reasonable belief of his or her legal entitlement to withhold payment. Grounds for the entitlement include, but are not limited to, the following: services were not rendered, goods were not delivered, goods or services purchased are faulty, not as promised, or otherwise unsatisfactory, or there was an overcharge.

-8-

16.   Both actions were tried on November 18, 2016 and Mrs. England prevailed.   She obtained one judgment for $1,281.47 (representing the $1,107 check and $174.47 in court costs) and another for $278.95 (representing the $54.37 check, damages pursuant to Cal. Civil Code § 1719(a)(1) & (2), plus $30 in court costs).

17.   Thereafter, on December 20, 2016, Mrs. England assigned the judgments to the plaintiff.   Under the terms of the assignment, Mrs. England transferred all rights in each judgment to the plaintiff but he agreed to split any recovery with Mrs. England as consideration for the assignment.   Docket 33 at ¶ 7, 8; Exhibits 8 and 9.   Even though any recovery would be divided, the assignment gave the plaintiff full discretion to collect or not collect the judgments.

18.   When the plaintiff attempted to collect the judgments, this bankruptcy case was filed on June 14, 2017.   The plaintiff timely filed a complaint seeking to have the assigned judgments declared nondischargeable under 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).

19.   To the extent any of the conclusions of law below are findings of fact, they are incorporated by reference as findings of fact.

## Conclusions of Law

20.   To the extent any of the foregoing findings of fact are conclusions of law, they are incorporated by reference as conclusions of law.

///

## Real Party in Interest/Unauthorized Practice of Law

21. The defendants assert as a preliminary matter that the plaintiff, who is not a licensed attorney, is engaging in the unauthorized practice of law by filing this adversary proceeding to enforce collection on behalf of judgment creditor Penny England.

22. The defendants contend that the plaintiff's agreement to share anything collected from the judgments with Mrs. England is indicative of an attorney/client relationship where the attorney is representing a client for a contingency fee. However, as noted above, Mrs. England transferred the judgments to the plaintiff. He is not representing Mrs. England.

23. Further, even if the plaintiff received an assignment for purposes of collection for the ultimate benefit of Mrs. England, rather than an absolute assignment, the plaintiff as an assignee for collection may proceed in his own name as a real party in interest. See, e.g., Cohn v. Thompson, 128 Cal. App. 783, 788 (1932). Hence, an individual who is unlicensed to practice law may take an assignment of a claim for collection and prosecute it in his name while acting as his own attorney. Cf. Gresham v. Superior Court, 44 Cal. App. 2d 664 (1941).

## 11 U.S.C. § 523(a)(2)(A)

24. 11 U.S.C. § 523(a)(2) provides that an individual is not discharged "from any debt for money . . . , to the extent obtained by- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . . "

25.   11 U.S.C. § 523(a)(2)(A) requires a showing that: (1) the defendants made representations; (2) known to be false when made; (3) with the intent and purpose of deceiving the plaintiff's predecessor; (4) upon which the plaintiff's predecessor justifiably relied; and (5) causing damage to the plaintiff's predecessor. <u>Younie v. Gonya (In re Younie)</u>, 211 B.R. 367, 373 (B.A.P. 9th Cir. 1997); <u>see also</u> <u>Providian Bancorp. (In re Bixel)</u>, 215 B.R. 772, 776-77 (Bankr. S.D. Cal. 1997).

26.   The second and third elements are missing here.

27.   The plaintiff's primary theory of this case is that the defendants obtained the use of the home for the month of August 2016 by making the implied misrepresentation to Mrs. England that their two checks would be honored by their bank.  They made a promise they did not intend to keep.

28.   It has yet to be established whether the defendants or the Englands own the beneficial interest in the home.  The issue was not decided in the unlawful detainer action because it was dismissed prior to trial.  And, while the two small claims court actions were decided adversely to the defendants, there is no trial record suggesting that the defendants owed rent to Mrs. England.  The state court could have just as easily based its decision on the defendants' obligation to reimburse the mortgage and insurance payments to Mrs. England.

29.   However, whether the defendants' two checks were for rent or for the mortgage and insurance, this is not a case where a debtor knowingly tendered a worthless check to a creditor, or intended at the time of its issuance to stop its payment.  There is no evidence that the defendants did not have sufficient funds

-11-

1  on deposit at the drawee bank to cover the checks.  Rather, the
2  defendants instructed their bank to stop payment on the checks
3  after Mrs. England served them with the three-day notice and took
4  the position that she, not the defendants, owned the home.

5      30.  The court concludes that when the checks were written
6  and delivered to Mrs. England, the defendants intended to pay the
7  August "home" payments as they had done since 2005.  Only when
8  Mrs. England made clear to the defendants that she intended to
9  dispossess them despite their belief that they owned an interest
10  in the home, did the defendants stop payment on the checks.

11      31.  The plaintiff argues that the state court judgments
12  establish the defendants' fraud.  This argument is premised on
13  the assertion that a judgment under Cal. Civil Code § 1719
14  necessarily entails a determination that the defendants committed
15  fraud.  The court disagrees.

16      32.  For one thing, section 1719 does not use the words
17  fraud, fraudulent, wrongful, malice, or willful nor does it infer
18  fraudulent intent from the issuance of a dishonored check.  It is
19  enough that the drawer issue a check that is dishonored and then
20  fails to make it good after the notice required by section 1719.

21      33.  Section 1719 establishes a statutory penalty when a
22  drawer "passes a check on insufficient funds."  Provided the
23  requisite notices are given, this penalty may be meted out when a
24  check is dishonored because of a "[l]ack of funds or credit in
25  the account. . . ."  Cal. Civil Code § 1719(a)(6)(A).  There is
26  no requirement that the drawer know that there are insufficient
27  funds at the time the check is written.
28  ///

34.  Section 1719(a)(6)(C) also equates stopping payment on a check with passing a check on insufficient funds provided the drawer does not have "a reasonable belief of his or her legal entitlement to withhold payment" because of a good faith dispute with the payee, such as "services were not rendered, goods were not delivered, goods or services purchased are faulty, not as promised, or otherwise unsatisfactory, or there was an overcharge."  Cal. Civil Code § 1719(b).

35.  The plaintiff equates the defendants' lack of a reasonable belief in their legal entitlement to withhold payment (a determination that arguably might be implied from the entry of the $278.95 judgment), with an intent to defraud Mrs. England. Lacking such a reasonable belief at the time the checks were stopped, however, is a long way from intending to defraud Mrs. England at the time the checks were tendered.

36.  It also bears mention that only the judgment for $278.95 apparently includes the treble damages authorized by section 1719(a)(2).  While the precise calculation of the amount of this judgment is a bit of a mystery, it is based on the $54.37 check, plus the service charge of $25 authorized by section 1719(a)(1), the cost of mailing the certified mail notice (this amount is not separately stated in the judgment) required by section 1719(a)(2), and $30 in court costs.  The judgment amount obviously includes a trebling of at least some of these amounts.

37.  However, the judgment for the $1,107 check was not trebled nor was a service charge added.  Only an additional $174.47 for court costs was awarded.  This suggests that the plaintiff failed to prove the defendants lacked a good faith

-13-

dispute with Mrs. England when this check was stopped.  See Cal.
Civil Code § 1719(a)(3).

    38.  Hence, assuming that a liability for a trebled judgment
under section 1719 necessarily entailed a determination that the
defendants had perpetrated an intentional fraud (which it does
not), then only the smaller of the two judgments would be
excepted from discharge.  The larger judgment was not trebled or
even doubled.

    39.  There are a multitude of bankruptcy cases all holding
that a debtor's liability under a state bad check statute may not
be used to establish fraudulent intent for purposes of 11 U.S.C.
§ 523(a)(2)(A).  See, e.g., Phoenix Fin. Solutions, Inc. v.
Williams (In re Williams), 2015 WL 430242, at *3 (Bankr. N.D.
Ohio 2015); Spa Cover, Inc. v. Hatley (In re Hatley), 2009 WL
5205385, at *3-4 (Bankr. E.D. Tenn. 2009); Capitol Chevrolet v.
Bullock (In re Bullock), 322 B.R. 176, 180 (Bankr. M.D. Ala.
2005); Nite Lite Signs, etc., v. Philopulos (In re Philopulos),
313 B.R. 271, 280 (Bankr. N.D. Ill. 2004); Mega Marts, Inc., v.
Trevisan (In re Trevisan), 300 B.R. 708, 718 (Bankr. E.D. Wis.
2003); Union Nat'l Bank & Trust v. Guest (In re Guest), 193 B.R.
745, 748-49 (Bankr. E.D. Pa. 1996); Check Control, Inc. v.
Anderson (In re Anderson), 181 B.R. 943, 947-48 (Bankr. D. Minn.
1995).  This court sees no reason to depart from these well
reasoned cases.

    40.  The plaintiff also argues that the defendants' intent
to deceive the Englands can be inferred from all the
circumstances surrounding the acquisition, use, and occupancy of
the home.  There are two problems with this argument.

41.   First, the plaintiff received only an assignment of the two judgments.  The Englands did not assign to him any other claims against the defendants, including those related to the purchase, use, and improvement of the home, or relating to the purchase and installation of the solar panels.  Indeed, the Englands are pursuing these claims in a separate proceeding, Adv. No. 17-2135, for their own account.

42.   Second, to the extent the plaintiff can be permitted to seek relief based on more than just the tender of two checks that were later dishonored, as the court's findings above make clear, the plaintiff has not proven by a preponderance of the evidence that the defendants have wrongfully occupied the home or claimed title to it, or that they have committed waste.

### 11 U.S.C. § 523(a)(4)

43.   The second claim for relief in the complaint asserts that the defendants "had a fiduciary duty to make all rental payments as they became due."  When they stopped payment on their checks, the defendants allegedly breached that fiduciary duty and the resulting liability is made nondischargeable by 11 U.S.C. § 523(a)(4).

44.   Assuming a landlord-tenant relationship existed between the Englands and the defendants, this did not give rise to a fiduciary relationship within the meaning of section 523(a)(4).  Such a relationship is generally based on a technical or express trusts; it does not arise out of a traditional commercial relationship such as landlord-tenant.

///

45.  To be a fiduciary within the meaning of section 523(a)(4), it must be shown that a debtor was obligated to deal with a defined trust res for the benefit of another.  See, e.g., Woodworking Enters., Inc. v. Baird (In re Baird), 114 B.R. 198, 202 (B.A.P. 9th Cir. 1998).

46.  Were the court to determine that the alleged landlord-tenant relationship was a fiduciary relationship within the meaning of section 523(a)(4), every breach of contract would constitute a nondischargeable breach of fiduciary duty.  That is all the plaintiff is alleging here – the defendants owed rent and did not pay it.  That is not a breach of fiduciary duty.  At most, it is a breach of contract.

47.  Intentional breaches of contract are not actionable under section 523(a)(2)(A), section 523(a)(4), or section 523(a)(6).  Lockerby v. Sierra, 535 F.3d 1038, 1042-43 (9th Cir. 2008) (holding that intentional breach of contract does not support a section 523(a)(6) claim just because it was substantially certain that the breach would cause injury); Whited v. Galindo (In re Galindo), 467 B.R. 201, 213 (Bankr. S.D. Cal. 2012) (holding that "[a]n intentional breach of a contract alone will not trigger the 'willful and malicious injury' dischargeability exception"); Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001); Donaldson v. Ortenzo Hayes (In re Ortenzo Hayes), 315 B.R. 579, 590 (Bankr. C.D. Cal. 2004) (holding that intentional breaches of contract require tortious conduct in order for the debt arising from the breach to be excepted from discharge); see also Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631, 648 (Bankr.

-16-

1   W.D. Wis. 2010) (holding that "intentional breach of contract is
2   not fraud under § 523(a)(2), and a promise about future acts,
3   without more, likewise does not constitute a misrepresentation").
4
5                   **11 U.S.C. § 523(a)(6)**
6        48.  11 U.S.C. § 523(a)(6) provides that an individual is
7   not discharged "from any debt for willful and malicious injury by
8   the debtor to another entity or to the property of another
9   entity." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Baldwin v.
10  Kilpatrick (In re Baldwin), 249 F.3d 912, 917 (9th Cir. 2001).
11       49.  The term willful means a deliberate or intentional
12  injury.  Kawaauhau, 523 U.S. at 61.  This requires proof not only
13  that the actor intended to act, but that the injury was also
14  intended by the actor.  Id.
15       50.  Determining the intent aspect of a willful injury is a
16  subjective standard, focusing on the debtor's state of mind.
17  Carrillo v. Su (In re Su), 290 F.3d 1140, 1144-46 (9th Cir.
18  2002); Hughes v. Arnold, 393 B.R. 712, 718 (E.D. Cal. 2008);
19  Ormsby v. First Am. Title Co. of Nevada (In re Ormsby), 386 B.R.
20  243, 250 (E.D. Cal. 2008).  The debtor must have had the
21  subjective intent to harm or the subjective belief/knowledge that
22  harm is substantially certain to result from his conduct.  Su at
23  1142, 1144.
24       51.  A willful injury, however, is not necessarily malicious
25  for purposes of 11 U.S.C. § 523(a)(6).  To be malicious, an
26  injury must be (1) a wrongful act, (2) done intentionally, (3)
27  which necessarily causes injury, and (4) is done without just
28  cause or excuse.  Su at 1146-47 (citing In re Jercich, 238 F.3d

1   1202, 1209 (9th Cir. 2001)); <u>see</u> <u>also</u> <u>Jett v. Sicroff (In re</u>

2   <u>Sicroff)</u>, 401 F.3d 1101, 1106 (9th Cir. 2005).

3        52.  The third claim for relief asserts that the defendants'

4   act of "stopping payment [was] in furtherance of the continuing

5   fraud and criminal acts. . . ."

6        53.  As noted above in paragraphs 40, 41, 42, the plaintiff

7   was not assigned anything other than the two judgments.  No other

8   causes of action, whether for fraud, slander of title, waste, or

9   any other tort, were assigned to the plaintiff.  And, to the

10  extent this is not an impediment to the plaintiff straying beyond

11  the state court record that resulted in the judgments, he has not

12  established anything more than that the defendants stopped

13  payment on two checks after being threatened with eviction by

14  Mrs. England.  There is no convincing circumstantial evidence

15  that the defendants tendered the checks knowing that they would

16  be dishonored or that they intended to stop payment on the

17  checks.

18

19                         Conclusion

20       The small claims judgments are dischargeable obligations.  A

21  judgment will be entered in favor of the defendants.

22       Each side shall bear their own fees.  There is no contract

23  or statute providing for an award of attorneys' fees.  The

24  defendants' costs may be requested consistent with Fed. R. Bankr.

25  P. 7054(b)(1).

26  Dated: 21 August 2018         By the Court.

27

28                                Michael S. McManus
                                  United States Bankruptcy Judge

                              -18-

# United States Bankruptcy Court
# Eastern District of California

### Certificate of Mailing

The undersigned deputy clerk in the office of the United States Bankruptcy
Court for the Eastern District of California hereby certifies that a copy of the
document to which this certificate is attached was mailed today to the following
entities at the addresses shown below or on the attached list.

Mathew M. Lakota                    Richard L. Jare
1900 Oro Dam Blvd E #12-300         6440 Carolinda Drive
Oroville CA 95966                   Granite Bay CA 95746

Dated: 8/21/2018                    By:_____
                                    Deputy Clerk